# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **FLETCHER WILLIAMS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:13-cv-01557-RDP** |
| | } | |
| **CSX TRANSPORTATION, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. 25), filed August 28, 2014.  This Motion (Doc. 25) has been fully briefed.  (Docs. 33, 35).  Plaintiff's Complaint (Doc. 1) alleges Defendant CSX Transportation, Inc. violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.  (Doc. 1).  In particular, Plaintiff asserts race discrimination claims (Counts One and Two) and retaliation claims (Counts One and Two).  (Doc. 1).  These claims are now before the court on Defendant's Motion for Summary Judgment (Doc. 25).

This case centers on two incidents that Plaintiff has admitted were his misconduct. Plaintiff is a locomotive engineer, running freight in Birmingham, Alabama for Defendant CSX Transportation.  On more than one occasion, Defendant has found Plaintiff's performance lacking.  In August 2012, Plaintiff left an unqualified person behind the controls of a moving train.  For this violation of company policy and federal regulations, Plaintiff was given a ten-day suspension.  Eight months later, Plaintiff's supervisors found Plaintiff's train on the wrong side of the tracks; Plaintiff parked his engine at the north end of a Birmingham area receiving yard in

violation of a bulletin issued by Defendant.  For this second transgression, Defendant suspended Plaintiff for twenty days.  Plaintiff challenges Defendant's discipline of him, contending it was because of his race.

Again, Plaintiff readily admits that each incident was a work rule violation.  His argument is that "everyone else was doing it, too."  That is, although conceding his actions were in violation of Defendant's policy and federal law, Plaintiff claims his white coworkers were not similarly disciplined for their substantially similar misconduct.  To the contrary, after a careful review of the undisputed facts in the Rule 56 record and the parties' respective arguments, the court concludes that Plaintiff has failed to identify a single appropriate comparator.  Therefore, for the reasons stated below, Defendant's Motion (Doc. 25) is due to be granted.

## I.      Standard of Review

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.  The Eleventh Circuit has "consistently held that conclusory allegations without specific supporting facts have no probative value."  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

## II.    Facts[1]

### A.    Background

Plaintiff Fletcher Williams, an African-American, is employed as a Locomotive Engineer for Defendant CSX Transportation, Inc.  (Doc. 28, Swafford Decl. ¶ 18).  He has been employed with Defendant since June 23, 1997.  (*Id.*).  Defendant is a railroad company operating in the Eastern United States and Canada and headquartered in Jacksonville, Florida.  (*Id.* at ¶ 4).  *Id.* Defendant employs approximately 30,000 employees, most of whom, like Plaintiff, are unionized members of collective bargaining units.  (*Id.*).  The terms of their employment are governed by collective bargaining agreements as well as the federal Railway Labor Act ("RLA").  (*Id.*).

Defendant maintains Operating Rules that govern conditions and actions on railroads operated by Defendant in the United States.  (*Id.* at ¶ 5).  Plaintiff's violations of these Operating Rules and his subsequent discipline are at the heart of this controversy.

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

### B. Defendant's Individual Development and Personal Accountability Policy ("IDPAP") and Investigations

Defendant addresses engineer discipline issues under its Individual Development and Personal Accountability Policy ("IDPAP"), which categorizes rule violations into minor offenses, serious offenses, and major offenses. (*See* Doc. 31-3, IDPAP). Minor offenses are the result of "minor deviations," which can result in informal corrective action, but if repeated, more formal corrective action may be appropriate. (*Id.* at 2). Serious offenses under the IDPAP are those that are more serious than minor, but the commission of a single serious offense typically is insufficient to warrant dismissal. (*Id.* at 3). Nevertheless, "suspension and/or retraining may be appropriate depending upon the circumstances." (*Id.*). The IDPAP lists examples of serious offenses, including but not limited to violations involving securing locomotives. (*Id.*). Major offenses under the IDPAP are those offenses that "warrant removal from service pending a formal hearing and possible dismissal from service for a single occurrence if proven responsible." (*Id.* at 4).

Where appropriate, Defendant sends a charge letter to the employee and sets an investigation hearing. (Doc. 32, Ex. B-1, Holtz Dep. 23:17-19; *see, e.g.*, Doc. 31-4, Charge Letter, May 28, 2013). Defendant's IDPAP follows a progressive discipline approach, in which any discipline imposed depends on "the nature of the offense, the employee's record, and taking into consideration the employee's willingness to accept responsibility." (Doc. 31-3, IDPAP, at 4-5; Doc. 32, Ex. B-1, Holtz Decl. ¶ 13). For the first serious offense in a three-year period, the IDPAP prescribes discipline of five to fifteen days actual suspension. An employee may face up to thirty days actual suspension for a second such offense, and up to dismissal for a third serious offense. (Doc. 31-3, IDPAP, at 5).

Pursuant to the Collective Bargaining Agreement ("CBA"), hearings are held to determine whether an employee is responsible for the charged offense(s). (Doc. 32, Ex. B-1, Holtz Decl. ¶ 17; *see also* Doc. 31-3, IDPAP, at 4).  The investigation consists of a formal hearing where the charged employee is afforded union representation and given the opportunity to confront witnesses, present evidence, and testify on his or her own behalf.  (Doc. 32, Ex. B-1, Holtz Decl. ¶ 18; *see also* Doc. 31-3, IDPAP, at 4-5).  The hearing is presided over by a Conducting Officer who is responsible for overseeing a fair and impartial hearing.  (Doc. 32, Ex. B-1, Holtz Decl. ¶ 19).

### C.    The Work Rule Violations

As noted above, at issue in this case are the circumstances surrounding two discrete work rule violations attributable to Plaintiff.  The court discusses the Rule 56 evidence related to each of these violations, in turn.

### 1.    The August 28, 2012, Incident — Plaintiff's Violation of Operating Rule C-1

In this case, the first relevant disciplinary event involving Plaintiff occurred in August 2012 when he left a moving train in the control of an unsupervised, unqualified trainee engineer. The material facts surrounding this incident are largely undisputed.

On August 28, 2012, Trainmaster James Jackson performed an Operational Test on Plaintiff's train, which required Plaintiff to bring the train to a stop at the display of an electronic signal on a banner.  (Doc. 26, Pl. Dep. 117:10-118:1).  While performing this "banner test," Jackson observed Plaintiff's train coming quickly into the control point.  (Doc. 30, Jackson Decl. ¶ 10).  Over the radio system, Jackson heard Plaintiff giving trainee D.D. Crook instructions, telling Crook to reduce the speed of the train. (*Id.* ¶ 11).  Plaintiff was not in the locomotive cab when giving these instructions.  (Doc. 26, Pl. Dep. 103:23-104:3).

When the train stopped, Jackson boarded the train with fellow trainmasters Russell Weeks and Byrl McCoy.  (Doc. 30, Jackson Decl. ¶ 13).  Jackson saw that Crook "was sitting at the controls of the locomotive" and that Plaintiff was not with Crook.  (*Id*.).  After Crook informed Jackson that Plaintiff was not in the cab, Jackson walked towards the back of the train to locate Plaintiff.  (*Id*. at ¶ 13).  Jackson found Plaintiff on the front porch of the third locomotive.  (*Id*. at ¶¶ 13-14).  Plaintiff had left the cab to turn off an alarm that was ringing elsewhere in the train.  (Doc. 26, Pl. Dep. 96:11-19).  Plaintiff's violated Operating Rule C-1 because he left an unqualified trainee engineer in control of a moving train without direct supervision as required by federal regulations.  (*See* Doc. 30, Jackson Decl. ¶ 14; Doc. 31-1, CSX Operating Rules).  However, at the time of the violation, Jackson praised Plaintiff for stopping for the banner test.  (*See* Doc. 26, Pl. Dep. 122:3-23).  Jackson allegedly told Plaintiff, "y'all did a good job."  (*Id*. at 122:22).  Nonetheless, Plaintiff admits that Jackson instructed him not to leave the locomotive cab to turn off the alarm while the train was still moving.  (*Id*. at 122:8-21).  Instead, he indicated Plaintiff should "let the alarm go off."  (*Id*.).  Jackson discussed the incident with Weeks and McCoy, and because Plaintiff reported directly to Jackson, Jackson was the one who entered Plaintiff's Operational Test failure.   (Doc. 30, Jackson Decl. ¶ 15).  Plaintiff quarrels with (1) Jackson's reaction immediately after the incident and (2) Jackson thereafter documenting the work rule violation.  However, this dispute is not material as it relates to Plaintiff's claim of discrimination.  Plaintiff's claim is based on disparate discipline; he does not contend that he was falsely accused of a work rule violation. [2]

---

[2] Plaintiff also asserts that he was not properly trained on FRA rules before the August 2012 incident, and therefore, was not aware that his actions were against any policy or regulation at that time.  (*Id*. at 128:1-19, 157:14-159:13).  Plaintiff was suspended for ten days for violating Operating Rule C-1 and federal regulations, which dictate that trainee engineers may operate only under the direct supervision of an instructor engineer. However, there simply is no element of "discrimination" as it relates to Plaintiffs assertion that he was not properly trained as to the work rule. That is, there is no indication, even assuming Plaintiff did not receive training as to the work rule, that

**(a)     Investigation of Plaintiff's Operating Rule C-1 Charge**

On September 5, 2012, Defendant charged Plaintiff with failing to ensure that his train was operating safely.  This action was taken because Plaintiff left the cab of a moving train and allowed an unqualified trainee engineer to operate the moving train without supervision — a "serious" violation under the IDPAP.  (Doc. 28-5, Charge Letter, Sept. 5, 2012).  Plaintiff's formal investigation hearing was held on October 11, 2012, and he was represented by his local union chairman, Mike Stone.  (Doc. 26, Pl. Dep. 130:13-14; Doc. 28, Swafford Decl. ¶ 21; Doc. 30, Jackson Decl. ¶ 18).  At the hearing, Jackson testified that he saw Plaintiff's train coming into the terminal at a fast rate of speed, and he heard Plaintiff giving Crook instructions using the internal radio system (including telling Crook to reduce the speed of the train).  After the train stopped, Jackson boarded with Weeks and McCoy and saw Crook "sitting at the controls of the locomotive," but Plaintiff was not in the cab with Crook, as required by rule.  (Doc. 28-6, Hr'g Tr., Oct. 11, 2012, at 27:28-29:25; *see also* Doc. 30, Jackson Decl. ¶ 19).  At the hearing, Plaintiff conceded that he had left Crook in control of the moving train and was in another area giving Crook directions over the radio.  (Doc. 28-6, Hr'g Tr., Oct. 11, 2012, at 68:1-39).

**(b)     Plaintiff Suspension for Violating Operating Rule C-1**

Division Manager Jermaine Swafford determined that Plaintiff should be disciplined for violating Operating Rule C-1 because he left an unsupervised, unqualified trainee in control of a moving train. (Doc. 28, Swafford Decl. ¶ 22).  Swafford is African-American.  (*Id.* at ¶ 3).  On November 9, 2012, Plaintiff was notified by letter that he was being suspended for ten days for violating Operating Rule C-1.  (Doc. 28-7, Discipline Letter, Nov. 9, 2012).  Plaintiff evidently

---

any such failure to train was based upon his race. Moreover, it is hardly remarkable to note that a Locomotive Engineer in Plaintiff's position is required to be aware of safety work rules and federal regulations.

first learned of the suspension on November 12, 2012, after reporting to work.[3]   (Doc. 1-1, EEOC Charge, Dec. 18, 2012, at 1).

There is no dispute that, when Jackson assessed the infraction against Plaintiff on November 9, 2012, Jackson was unaware that Plaintiff had previously filed an EEOC charge against Defendant over two years earlier, in June 2010.[4]   (Doc. 30, Jackson Decl. ¶ 20). Similarly, when he assessed the ten-day suspension against Plaintiff in November 2012, Swafford was unaware that Plaintiff had filed an EEOC charge against Defendant.  (Doc. 28, Swafford Decl. ¶ 24).

### (c)   The December 2012 EEOC Charge Related to the Operating Rule C-1 Incident

On December 18, 2012, Plaintiff filed a second charge with the Equal Employment Opportunity Commission ("EEOC") claiming racially discriminatory discipline and retaliation related to the August 28 work rule violation.  (Doc. 1-1, EEOC Charge, Dec. 18, 2012, at 1).  On June 3, 2013, the EEOC issued a Dismissal and Notice of Right to Sue. (Doc. 1-1, EEOC Dismissal and Notice of Rights, June 3, 2013, at 2).

### 2.   The May 23, 2013, Incident — Violation of Bulletin 505

The second relevant disciplinary event involved in this case occurred on May 23, 2013, when Plaintiff failed to secure his train on the correct end of the receiving station.  Plaintiff was suspended for twenty days for this incident for violating West District Bulletin 505 Item 1-A ("Bulletin 505").  The details surrounding his suspension are not seriously disputed.

On May 23, 2013, Terminal Superintendent Robert Holtz observed Plaintiff and his conductor, C.E. Bolton, secure their equipment on the north end of a receiving yard.  (Doc. 32,

---

[3] After one of Plaintiff's coworkers informed him that he was not on the work schedule, Plaintiff called his local union representative who informed Plaintiff that he had been suspended.  (*Id.*).

[4] Plaintiff filed his initial charge of discrimination on June 9, 2010.  (Doc. 30, Jackson Decl. ¶ 20).  The record is unclear concerning precisely what he complained about in that charge.

Ex. B-1, Holtz Dep. 10:5-13:5).  This securement was in violation of Bulletin 505, which required that equipment be secured on the south end of the receiving track, with hand brakes placed on the south end.[5]  (*Id.* at 12:19-13:5).  Bulletin 505 was issued by the Atlanta Division on April 19, 2013, and went into effect on April 22, a month before Plaintiff's violation.  (Doc. 28-3, Gen. Bulletin 505).

After Holtz observed the violation, Holtz boarded the train to speak with Plaintiff.  (Doc. 32, Ex. B-1, Holtz Dep. 18:18-19:9).  Plaintiff admitted to Holtz that he had a copy of Bulletin 505 and that he had read it.  (*Id.* at 19:10-15; Doc. 26, Pl. Dep. 194:20-195:15).  Nonetheless, according to Plaintiff, he was not aware that he was supposed to tie down a train in the north end of the receiving yard.  (Doc. 26, Pl. Dep. 196:7-11).  Plaintiff testified that the violation occurred because the Yard Master never informed him where to leave the train, which is what Plaintiff claims normally occurs.  (*Id.* at 198:3-12).

Plaintiff claims Holtz told him he would not be disciplined for the violation:

And then that's when my conductor, he was like don't worry about it, guys.  I'm not going to write y'all up or anything like that.  I'm just going to write it as a ICI, and that's it.  We said, well, okay.

(*Id.* at 180:16-18).[6]  However, Holtz eventually did assess Plaintiff's violation.[7]

---

[5] Item 1-A of the Bulletin states that, effective April 22, 2013, "all inbound hump trains or cuts will be secured at the south end clearance point of the designated receiving yard track with all hand brakes applied on the south end." (*Id.*). It is undisputed that before starting a tour of duty, employees must read and understand the system and general bulletins that are applicable to the areas where they operate. (Doc. 26, Pl. Dep. 71:25-72:8; Doc. 28, Swafford Decl. ¶ 13; Doc. 30, Jackson Decl. ¶ 9; Doc. 32, Ex. B-1, Holtz Decl. ¶ 5; *see also* Doc. 31-1, CSX Operating Rule A-1, at 8 ("Before starting a tour of duty, employees must read, understand, and carry their own copy of the system and general bulletin(s) issued during their tour of duty.")).  Furthermore, neither party disputes that an engineer's failure to follow a properly issued bulletin is a violation of Operating Rule GR-55, the rule under which Plaintiff was charged.

[6] Plaintiff appears to reference the speaker as "my conductor" in his deposition testimony.  But Plaintiff's briefing clearly cites much of this language attributable to Holtz, the Terminal Superintendent.  (*See* Doc. 33, Pl. Resp., at 3).  The court understands that, in his testimony, Plaintiff intended to reference to statements predominantly made by Holtz.  (*See* Doc. 26, Pl. Dep. 180:1-3 ("They came . . . on the engine, and that's when Robert Holtz was speaking to us about the bulletin.")).  This conclusion is consistent with the court's duty to construe every inference in favor of the nonmovant.

Plaintiff claims that other train operators similarly violated Bulletin 505, and those crews were not disciplined for those violations. (Doc. 26, Pl. Dep. 199:10-24). But Defendant asserts that *Holtz* never observed any other crew violate Bulletin 505. (Doc. 32, Ex. B-1, Holtz Decl. ¶ 24).

> ### (a)   Plaintiff Charged with Violating Operating Rule GR-55 & Bulletin 505

After Holtz saw Plaintiff and Bolton tie the train down with the handbrakes on the north end of the terminal receiving yard, Holtz input his assessment of Plaintiff's performance. (Doc. 32, Ex. B-1, Holtz Dep. 17:25-18:5). Based on Holtz's assessment, on May 28, 2013, Plaintiff was charged with failing to secure equipment in accordance with special instructions. (*See* Doc. 28-8, Charge Letter, May 28, 2013). Plaintiff's formal investigation hearing was held on June 25, 2013, in Bessemer, Alabama, where he was represented by his local union chairman, Brian Killough. (*See* Doc. 28-9, Hr'g Tr., June 25, 2013, at 7).

At the hearing, Holtz testified that he saw Plaintiff's train arrive at Birmingham terminal and saw Plaintiff's crew tie their train down at the north end of the receiving yard, which is a violation of Bulletin 505. (*Id.* at 9:19-26). Although Plaintiff initially disputed the charges at the hearing (*id.* at 12:26-28), Plaintiff admitted that he failed to secure his train at the south end clearance point of the Birmingham receiving yard, admitting that his crew "tied the handbrakes on the north end" of the terminal. (*Id.* at 12:32-13:30, 22:15-26). According to Plaintiff, after

---

Furthermore, to clarify, ICI stands for "Informal Corrective Instruction." (Doc. 32, Ex. B-1, Holtz Dep. 44:10-14). An ICI is a nondisciplinary event that is recorded and kept in an employee's file. (*See id.* at 44:10-1; Doc. 26, Pl. Dep. 191:21-192:24).

[7] Plaintiff argues that it was Holtz who said, "I'm not going to write y'all up." (*Id.* at 179:24-181:4). Defendant disagrees with this account. Instead, Defendant contends that Holtz advised Plaintiff about the purpose of the Operational Test, the results of the Operational Test, and that the failure would be documented in Plaintiff's Operational Test report. (Doc. 32, Ex. B-1, Holtz Dep. 19:6-9). This disagreement is not material. Again, Plaintiff's contention is not that he is innocent of violating the work rule (or, for that matter, there was no factual basis to "write [him] up."). Rather, he contends that this work rule was not uniformly applied.

the train was stopped at the north end, Holtz instructed him to leave the cut on the north end even though he (Holtz) claimed having it there was a rule violation.[8]  (*Id.* at 19:11-15).  Plaintiff also explained that, at the time of the violation, it was his first time in the train yard in seven months. (*Id.* at 16:19-23).

**(b)      Plaintiff's Internal Discrimination Complaint Against Defendant**

On June 26, 2013, Plaintiff made a complaint, via Defendant's internal ethics hotline, that Holtz racially discriminated against him and Bolton because Holtz assessed an infraction against them.  (Doc. 29, Wainwright Decl. ¶ 8).  Defendant's Ethics Team conducted an internal investigation and found that race was not a factor in Plaintiff's discipline.  (Doc. 29-3, Wainwright Investigative Summ.; *see also* Doc. 29, Wainwright Decl. ¶ 9-15).  Rather, the Ethics Team concluded that Plaintiff was appropriately disciplined for violating existing Operating Rules. (Doc. 29-3, Wainwright Investigative Summ.; *see also* Doc. 29, Wainwright Decl. ¶ 9-15).   During the investigation, Plaintiff's local union chairman and personal representative, Brian Killough, went on record stating that he did not believe Holtz's assessment against Plaintiff was racially motivated.  (*See* Doc. 29, Wainwright Decl. ¶ 15 (citing Doc. 29-3, Wainwright Investigative Summ., at 13)).

Prior to Plaintiff's internal complaint, Holtz had previously been accused of racial favoritism by Vanessa Sharp.  (*See* Doc. 32, Ex. B-1, Holtz Dep. 37:23-38:18).  Sharp alleged that Holtz and other managers used racial favoritism in awarding a promotion.  (*See id.* at 38:6-10).   However, after an investigation, Holtz was exonerated and the charge was found to be without merit.  (*See id.* at 57:24-58:14).

---

[8] It is undisputed that Holtz was not aware of Plaintiff's previous EEOC charges when he assessed the infraction against Plaintiff.  (Doc. 32, Ex. B-1, Holtz Decl. ¶ 25).

### (c) Plaintiff Suspended for Violating Operating Rule GR-55 & Bulletin 505

After Swafford reviewed the circumstances, Plaintiff was disciplined for violating Operating Rule GR-55 and Bulletin 505 based upon his failure to secure his train at the south end clearance point of the designated receiving yard track.  (Doc. 28, Swafford Decl. ¶ 27).  On July 25, 2013, Plaintiff was notified by letter that he was being suspended for twenty days. (Doc. 28-10, Discipline Letter, July 25, 2013).  At that time, Plaintiff had pending an EEOC charge related to the earlier August 28, 2012, incident and his consequent suspension.  (Doc. 26, Pl. Dep. 307:23-308:18; *see* Doc. 1-1, EEOC Charge, Dec. 18, 2012, at 1).

Plaintiff alleges that, when the twenty-day suspension was assessed against him, Defendant was aware that Plaintiff and his coworker, Bolton, had engaged in protected activity. (*See* Doc. 26, Pl. Dep. 307:23-308:18; Doc. 1-1, EEOC Charge, Dec. 18, 2012, at 1).  After the investigatory hearing, but before his second suspension was imposed, Plaintiff contacted Defendant's ethics hotline and reported that he believed his suspension was discriminatory. (Doc. 26, Pl. Dep. 308:18-21).  Moreover, Bolton -- but not Plaintiff -- testified regarding the alleged discrimination before Plaintiff's suspension was handed down.  (Doc. 28-9, Hr'g Tr., June 25, 2013, at 23:26-43).  And, in a document dated July 11, 2013, both Jackson and Holtz identified the person who likely made the June 26, 2013 internal complaint as either Bolton or Plaintiff.  (Doc. 29-3, Wainwright Investigative Summ., at 30, 31).

However, it is undisputed that Swafford was the decisionmaker regarding whether and how Plaintiff should be disciplined, and Swafford was not aware that Plaintiff had filed any EEOC charges or made any complaints internally to Defendant. (Doc. 28, Swafford Decl. ¶ 29; *id.* at ¶ 27).  In his July 25, 2013, discipline letter, Swafford indicated that the decision to discipline Plaintiff was "a result of the testimony and other evidence presented in the

investigation," which led to the determination that Plaintiff violated Bulletin 505 Item 1-A and Operating Rule GR-55.  (Doc. 28-10, Discipline Letter, July 25, 2013).

(d)       <strong>August 13, 2013, EEOC Charge</strong>

On August 13, 2013, Plaintiff filed a second EEOC charge.  The second charge alleged that Plaintiff's discipline for the May 23, 2013 violation was retaliatory.  (Doc. 1-1, EEOC Charge, Aug. 13, 2013, at 3).  On the same day, the EEOC terminated its processing of Plaintiff's charge and, at Plaintiff's request, issued a Notice of Right to Sue.  (Doc. 25, Ex. C-2, EEOC Notice of Right to Sue, Aug. 13, 2014).

It is undisputed Plaintiff violated the work rules at issue.  The question, therefore, is how Plaintiff was treated compared with other employees.

### D.       Plaintiff's Arguments Regarding Comparators

Holtz has testified that he is not aware of anyone else who has been charged with violating Bulletin 505.  (*See* Doc. 28-9, Hr'g Tr., June 25, 2013, at 10:14-30).  Nevertheless, Plaintiff offers several handwritten pages of notes, which he claims reveal the names of those similarly situated individuals who committed similar violations but who were not charged.  (Doc. 34-1, Pl. Aff.).  The court addresses each of the alleged comparators, in turn.

### 1.       B.M. Johnson and Kerry Hood Violate Bulletin 505

On May 18, 2013, B.M. Johnson and Kerry Hood,[9] two Caucasian engineers, failed to secure their train at the south end clearance point as outlined in Bulletin 505. (Doc. 29, Wainwright Decl. ¶ 13; *see also* Doc. 26, Pl. Dep. 237:8-15)).  Johnson read Bulletin 505 and attempted to comply with it, but was unable to do so because he did not know where the clearance point was located.  (Doc. 29, Wainwright Decl. ¶ 13).  Dantay Coleman was the Trainmaster present when the incident occurred.  (*Id.* at ¶ 14).  Coleman decided not to discipline

---

[9] The briefs and evidentiary submissions reference a Carry Hood and a Kerry Hood interchangeably.

Johnson or Hood for failing to follow Bulletin 505 because: (1) the Bulletin had only been in effect for a few days at the time of the offense; (2) Johnson and Hood were required to leave the train temporarily on the north end of the terminal so that an approaching train could connect to Johnson's train; and (3) Johnson attempted to comply with Bulletin 505. (*Id.*). Importantly, neither Jackson nor Holtz observed this incident. (Doc. 30, Jackson Decl. ¶ 25; Doc. 32, Ex. B-1, Holtz Decl. ¶ 28).

### 2.      Brian Painter Left Unqualified Engineer in Control of Stopped Train

Brian Painter and another engineer, both Caucasian, left an unqualified engineer in control of a stopped train -- *not a moving one* -- with Byrl McCoy present. (Doc. 26, Pl. Dep. 226:7-228:25). It is not a violation of Operating Rules to have an unqualified trainee engineer at the controls of a stopped train. (Doc. 30, Jackson Decl. ¶ 30). Jackson is not aware of any other engineers who violated Operating Rule C-1 by leaving an unqualified trainee in control of a moving train. (*Id.* at ¶ 15).

### 3.      E.E. Jones Disciplined for Running Through a Derail

On November 6, 2013, E.E. Jones, a Caucasian conductor, ran through a derail. (*Id.* at ¶ 23). Jackson was informed about Jones's infraction because, as Trainmaster, it was Jackson who was required to detect infractions committed by those in his assigned territory. (*Id.* at ¶ 24). Holtz never observed E.E. Jones run through the derail. (Doc. 32, Ex. B-1, Holtz Decl. ¶ 27). Regardless, Jones accepted responsibility for the violation, signed a waiver and received 10 days actual suspension as a result. (Doc. 30, Jackson Decl. ¶ 23).

### 4.      Danny Chastein, Randy Dotson, and P.K. Robinson Violating Operating Rules

Plaintiff also asserts that Danny Chastein, Randy Dotson, and P.K. Robinson all violated certain of Defendant's operating rules. However, neither Jackson nor Holtz observed Danny

Chastein run through a switch.  (Doc. 30, Jackson Decl. ¶ 26; Doc. 32, Ex. B-1, Holtz Decl. ¶ 29).  Neither Jackson nor Holtz observed Randy Dotson drag a break line.  (Doc. 30, Jackson Decl. ¶ 27; Doc. 32, Ex. B-1, Holtz Decl. ¶ 30).  And, neither Jackson nor Holtz observed P.K. Robinson run through a red board.  (Doc. 30, Jackson Decl. ¶ 28; Doc. 32, Ex. B-1, Holtz Decl. ¶ 31).

## III.   Discussion

Plaintiff's Complaint alleges discrimination under Title VII and § 1981.  (Doc. 1).  In particular, Plaintiff claims that when he was disciplined on two occasions for violations of Defendant's work rules, he was "subjected to discriminatory discipline because of his race" and "subjected to retaliation for protesting unlawful employment practices."  (Doc. 1 at 4-5).  Defendant's Motion for Summary Judgment (Doc. 25) seeks dismissal of all claims set forth in the Complaint.  For the reasons outlined below, the court concludes that Defendant is entitled to summary judgment on all of Plaintiff's claims.

### A.   Plaintiff's Claims of Discriminatory Discipline Based Upon Race

Plaintiff's Complaint alleges that Plaintiff suffered racially discriminatory discipline in violation of Title VII and § 1981.  (Doc. 1 at 5 (Count One and Two)).  Race claims asserted under Title VII and § 1981 are subject to the same standards of proof and court's employ the same analytical framework in addressing them.  *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  Accordingly, the elements of § 1981 race discrimination claim in the employment context are the same as those which must be met with respect to a Title VII disparate treatment claim.  *Watson v. Dean Dairy Holdings LLC*, 2:12-cv-972-RDP, 2014 WL 1155799 (N.D. Ala. Mar. 21, 2014).  For this reason, the court addresses Plaintiff's Title VII and § 1981 claims together, applying the same substantive analysis.

Under Title VII and § 1981, "it [is] unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .'" *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003) (quoting 42 U.S.C. § 2000e–2(a)(1)).   Plaintiff is not required to prove directly that race was the reason for the employer's challenged decision; instead, Plaintiff may rely on circumstantial evidence of discrimination.  *See, e.g.*, *id.*; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 526 (1993).   Here, Plaintiff pointed to no direct evidence of discrimination but instead has opted to offer circumstantial evidence to support his claims.  However, as explained in more detail below, Plaintiff's claims of discriminatory discipline fail for two reasons.  First, he cannot establish a *prima facie* case of discrimination.   Second, and alternatively, although Defendant has offered legitimate, nondiscriminatory reasons for its decisions to suspend Plaintiff, Plaintiff has not offered any evidence of pretext.   For these reasons, Defendant is entitled to summary judgment on each of Plaintiff's discrimination claims.

      **1.**      **Plaintiff Has Failed to Establish a *Prima Facie* Case of Discriminatory Discipline Because Plaintiff Has Not Identified a Viable Comparator.**

In order to establish a *prima face* case, a Title VII plaintiff must make an initial showing that is sufficient to raise an inference of discrimination.  The model to be used in assessing this inquiry is, of course, a flexible one.  But as a general rule, to make out a *prima facie* case, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

In cases involving alleged racial bias in the application of discipline for violation of work rules, in addition to being a member of a protected class, a plaintiff must show either (1) that his employer did not believe in good faith he violated the work rule, or (2) that he engaged in misconduct substantially similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *Winborn v. Supreme Beverage Co.*, 572 F. App'x 672, 674 (11th Cir. 2014) (citing *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1135 (11th Cir. 2012)). The burden is on Plaintiff "to show a similarity between [his] conduct and that of white employees who were treated differently." *Gerwens*, 874 F.2d at 1541 (citations omitted); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."). And, "in determining whether [other employees] are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *op. modified by* 151 F.3d 1321 (1998). To be similarly situated, (1) the comparator must be similarly situated in "all relevant aspects"; and (2) the quantity and quality of the comparator's misconduct must be "nearly identical." *See Foster v. Biolife Plasma Servs.*, 566 F. App'x 808, 811 (11th Cir. 2014); *Murphree v. Colvin*, No. CV-12-BE-1888-M, 2014 WL 1923822, at *25 (N.D. Ala. May 12, 2014) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *Stone & Webster Const.*, 684 F.3d at 1135). After careful review, the court concludes Plaintiff has failed to carry his burden.

With regard to the August 28, 2012, and May 23, 2013, incidents, Plaintiff does not argue that Defendant did not believe in good faith he violated the work rule.  (*See* Doc. 26, Pl. Dep. 103:23-104:3, Doc. 28-6, Hr'g Tr., Oct. 11, 2012, at 68:1-39).  Instead, in each instance, Plaintiff admits he violated the rule.  He contends that he was singled out for more severe discipline as compared to his white coworkers because of his race.  (Doc. 33, Pl. Resp., at 8-11;  *see also* Doc. 26, Pl. Dep. 231:8-232:15 (Plaintiff confirming that the only basis for his belief that his suspensions were discriminatory is that he was punished when others were not)).

Plaintiff has identified a handful of Caucasian comparators, but the Rule 56 record evidence does not support his assertion that those individuals are similarly situated to him.  As a backdrop to the analysis, the court notes two things.  First, Plaintiff has no personal knowledge of any incident or work rule violation similar to his.  Of course, he may rely upon comparator evidence that is otherwise found in the Rule 56 record; but, the point is that he himself cannot dispute Defendant's evidence regarding the details of the alleged comparators' purported violations.   Second, in some respects, Plaintiff seeks to rely on information from other employees who have (for example) approached him individually.  With respect to this second (or even third) hand information, Plaintiff's vague references to other (sometimes nameless) comparators fall far short of presenting substantial evidence upon which the court may conclude that Plaintiff has carried his burden of showing similarly situated Caucasian employees.  *See Amos v. Tyson Foods, Inc.*, 153 F. App'x 637, 647-48 (11th Cir. 2005) (noting where evidence of a comparator is limited to Plaintiff's allegations, supported entirely by the statements of other workers to Plaintiff, "[s]uch testimony is insufficient as a matter of law to establish a comparator for purposes of a retaliation claim"); *see also Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 658-59 (11th Cir. 1998) (rejecting plaintiff's "unverifiable, anecdotal testimony" about

alleged comparators where "witnesses who testified regarding these other incidents had no personal knowledge"); *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (rejecting plaintiff's testimony "based on the statements of unknown coworkers"). But even putting aside this fatal flaw, the court concludes that, even if Plaintiff's assertions were fully credited, he has not established that the persons he identified were proper comparators.

Beginning with the August 28, 2012, incident, Plaintiff identifies Brian Painter, a white engineer, as a comparator. According to Plaintiff, Painter left his trainee engineer in control of his *stopped* train, but was not disciplined by Byrl McCoy, his Caucasian Trainmaster. (Doc. 26, Pl. Dep. 218:8-11). Painter is not a proper comparator because, unlike Plaintiff, he did not leave the locomotive cab and his trainee engineer in control of a *moving* train. (Doc. 28, Swafford Decl. ¶ 20; Doc. 28-6, Hr'g Tr., Oct. 11, 2012, 68:1-69:2). Indeed, Painter's actions do not even appear to be a violation of any law or company policy. (*See* Doc. 30, Jackson Decl. ¶ 30).

Similarly, Plaintiff vaguely identifies "another white engineer" as a comparator for purposes of the August 28, 2012 incident. (Doc. 33, Pl. Resp., at 9). Plaintiff indicates that this anonymous engineer left his trainee, Darryl Fuller, in control of a *stopped* train. (*Id.*). Again, even putting aside both the lack of identity of the employee at issue, and the lack of any specificity about the details of the incident, again, the employee was not involved in similar misconduct because the train was *stopped*. (Doc. 26, Pl. Dep. 226:19-24). Therefore, this unnamed engineer is not an appropriate comparator.[10]

---

[10] Although the fact that the trains were stopped is dispositive, it is also relevant that in both the Johnson-Hood incident and the other anonymous engineer incident, the supervisor was not Jackson — the supervisor who was involved with Plaintiff's August 28, 2012 violation. As discussed in more detail below, differences in treatment by different supervisors can seldom be the basis for a claim of discrimination. *See Murphree v. Colvin*, No. CV-12-BE-1888-M, 2014 WL 1923822, at *25 (N.D. Ala. May 12, 2014).

With regard to his May 23, 2013 work rule violation, Plaintiff identifies B.M. Johnson and Kerry Hood, Caucasian engineers, as comparators.  Five days before the incident involving Plaintiff, on May 18, 2013, Johnson and Hood failed to secure their train at the south end clearance point as outlined in Bulletin 505.  (Doc. 29, Wainwright Decl. ¶ 13; *see also* Doc. 26, Pl. Dep. 237:8-15).  Johnson and Hood were not disciplined (Doc. 33, Pl. Resp., at ¶¶ 13-18; Doc. 26, Pl. Dep. 199:19-24), but Defendant argues that Johnson and Hood are not similarly situated for two reasons: (1) Plaintiff had a different supervisor than did Johnson and Hood, and (2) unlike Plaintiff, Johnson reportedly read Bulletin 505 and attempted to comply with it, but was unable to locate the correct clearance point.  (Doc. 29, Wainwright Decl. ¶ 13).  The court agrees.  The facts underlying these distinctions pointed out by Defendant are undisputed. Johnson and Hood are not proper comparators.

One of the factors the court considers in determining if another individual is a proper comparator is whether the decisionmakers were the same in the two instances being compared because "differences in treatment by different supervisors or decisionmakers can seldom be the basis for a viable claim of discrimination."  *Murphree*, 2014 WL 1923822, at *25 (citing *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001)); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012).  Plaintiff argues only that this distinction should not be dispositive.  *See Anderson v. WEBMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001).  But, as the Eleventh Circuit has indicated, this distinction matters. *See Gate Gourmet*, 683 F.3d at 1257.  Johnson and Hood are not similarly situated because it is undisputed that the supervisor who assessed Plaintiff's rule violation was different than the individual who responded to the Johnson-Hood incident.  That is, Terminal Superintendent Robert Holtz was

Plaintiff's supervisor for the May 23 incident, but Trainmaster Dantay Coleman was the supervisor of the Johnson-Hood incident.  (*Id.* at ¶ 14).

As a matter of logic and law, Coleman's leniency toward Johnson and Hood simply does not raise an inference of any discriminatory intent attributable to Holtz.  When two different supervisors independently analyze whether a work rule violation has occurred in two different instances (and what should be done about it), and they exercise their respective supervisory judgments in a different manner, there simply is no inference of disparate treatment raised.

Not only are the managers involved in assessing the violations different, but the nature and circumstances of the offenses are themselves different. Coleman decided not to discipline Johnson or Hood for failing to follow Bulletin 505 because (1) the Bulletin had only been in effect for "a few days"; (2) Johnson and Hood were required to leave the train temporarily on the north end of the terminal so that an approaching train could connect to Johnson's train; and (3) Coleman concluded that Johnson attempted to comply with Bulletin 505.  (*See* Doc. 29, Wainwright Decl. ¶ 14).  In Plaintiff's case, however, Plaintiff had been to the receiving yard before, and knew he was securing his train at the north end of the yard.  (Doc. 26, Pl. Dep. 16:19-23).  And, although Plaintiff concedes he read Bulletin 505, Plaintiff contends he still was not aware that he was supposed to secure his equipment at the south end.  (Doc. 32, Ex. B-1, Holtz Dep. 19:10-15; Doc. 26, Pl. Dep. 194:20-195:15).   These undisputed distinctions make a difference.  And, because of those differences, the court concludes that Johnson and Hood did not engage in nearly identical misconduct and are not appropriate comparators in this case.

Plaintiff also has identified E.E. Jones as a comparator.  (*See* Doc. 26, Pl. Dep. 243:1-244:14).  However, Plaintiff's attempt to compare himself to Jones is simply misplaced.  On November 6, 2013, Jones violated an Operating Rule by running through a derail.  (Doc. 30,

Jackson Decl. ¶ 23).  It is undisputed that Jones was disciplined for this infraction by Jackson — the same supervisor who disciplined Plaintiff for the August 28, 2012 incident.  (*Id.*).  Jones accepted responsibility for the infraction, signed a waiver and received a ten-day suspension. (*Id.*).  That Jones was disciplined and received a ten-day suspension fatally undermines Plaintiff's argument that Jones was treated differently than him.

In addition to his failure to identify any similarly situated comparator who was treated differently than him, the court notes that Plaintiff has admitted that he committed two "serious" violations of Defendant's Operating Rules (as defined by the IDPAP), in an eight-month span. To be sure, Plaintiff has not identified a single comparator who is similarly situated in this respect — *i.e.*, someone who committed two separate work rule violations, and therefore was at the second phase of discipline under Defendant's progressive discipline policy.

For these reasons, Plaintiff has fallen well short of showing that Defendant treated a similarly situated employee outside of his protected class more leniently or more favorably than him.  Contrary to Plaintiff's assertions, none of the evidence tends to show discriminatory enforcement of Defendant's work rules.  And, because Plaintiff has failed to establish a *prima facie* case of racial discrimination, Defendant is entitled to judgment as a matter of law on all of Plaintiff's race discrimination claims.

### 2. Defendant Has Articulated a Legitimate, Nondiscriminatory Reason for Suspending Plaintiff

Alternatively, even assuming that Plaintiff could establish a *prima facie* case of discrimination related to his November 2012 and July 2013 suspensions (and to be clear, he cannot), Defendant has articulated legitimate, nondiscriminatory reasons for disciplining Plaintiff.  Under the familiar *McDonnell Douglas* framework, once a *prima facie* case is made, the employer must articulate a legitimate, nondiscriminatory reason for its actions.  *See Brooks v.*

*Cnty. Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).  The employer's burden of production is "exceedingly light" and involves no credibility determination.  *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1993).  Here, Defendant has easily carried its burden.

First, Plaintiff violated Operating Rule C-1 by leaving an unqualified engineer in control of a moving train.  (Doc. 26, Pl. Dep. 103:23-104:3).  For this serious violation, Defendant suspended Plaintiff for ten days — a time period squarely within the five to fifteen day range that the guidelines proscribe under Defendant's IDPAP for first-time serious violations.  (*See* Doc. 28-7, Discipline Letter, Nov. 9, 2012).  Only eight months later, Plaintiff admits that he again violated Operating Rules by disregarding Bulletin 505 when he secured his train at the wrong end of the receiving yard.  (*See* Doc. 26, Pl. Dep. 195:6-196:11).  For this second serious violation, Plaintiff was suspended twenty days.  (Doc. 28-10, Discipline Letter, July 25, 2013).  In response to this second violation, Defendant was permitted to suspend Plaintiff up to thirty days under its progressive discipline policy.  (Doc. 31-3, IDPAP, at 5).  In articulating these legitimate reasons, Defendant has easily exceeded its burden of dispersing any inference of discrimination that even arguably was raised by a *prima facie* showing.

### 3.  Plaintiff Has Failed to Show His Discipline Was Pretext for Discrimination

Once an employer has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination disappears, and the burden shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).  "An employer's stated reason is not a pretext unless it is shown that both: (1) the reason was false; and (2) the real reason was unlawful." *Burback v. BNSF Ry. Co.*, 963 F. Supp. 2d 1255, 1262-63 (N.D. Ala. 2013) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515).  A plaintiff may show a pretext either "directly by

persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. In both instances, a plaintiff must show pretext with "concrete evidence in the form of specific facts." *Bryant*, 575 F.3d at 1308. Mere "conclusory allegations and assertions" will not suffice. *Id.* Here, Plaintiff attempts to establish pretext by suggesting, that at the time of each of Plaintiff's admitted rule violations, both Jackson and Holtz told Plaintiff that he would not be disciplined. Although limited portions of the parties' accounts appear disputed, even assuming the accuracy of Plaintiff's account (as the court must), and taking into account the uncontroverted Rule 56 record evidence, Plaintiff has failed to present substantial evidence of pretext.

First, with regard to Jackson's assessment of Plaintiff's August 28, 2012, rule violation, Plaintiff testified that Jackson initially told Plaintiff he "did a good job" on the banner test. (*See* Doc. 26, Pl. Dep. 122:3-23). According to Plaintiff, this shows that Plaintiff's subsequent discipline was a pretext for discrimination. However, Jackson assessed Plaintiff a rule violation for leaving an unqualified trainee in control of a moving train -- in violation of Operating Rule C-1 -- not for failing the banner test. (Doc. 28-7, Discipline Letter, Nov. 9, 2012). Beyond the entirely unsupported assertions that Defendant treated Plaintiff's comparators differently, Plaintiff has not provided the court with any evidence that suggests the real reason for suspending Plaintiff in November 2012 was his race.[11]

Second, with regard to Holtz's assessment of Plaintiff's May 23, 2013, rule violation, Plaintiff argues Holtz told Plaintiff, "I'm not going to write y'all up." (Doc. 26, Pl. Dep. 180:16-18). Defendant disputes this statement of fact. However, even assuming (as the court must at

---

[11] Although certainly not dispositive of the issue, it is noteworthy that Plaintiff's own representative, Brian Killough, is on record stating that he did not believe that Holtz's assessment against Plaintiff was racially motivated. (*See* Doc. 29, Wainwright Decl. ¶ 15 (citing Doc. 29-3, Wainwright Investigative Summ., at 13)).

this stage) Plaintiff's account is entirely correct, without more, Plaintiff cannot show that Defendant's proffered legitimate, nondiscriminatory reasons for Plaintiff's July 2013 suspension were pretextual.  Holtz charged Plaintiff with a rule violation on May 28, 2013, (Doc. 26, Pl. Dep. 194:7-10), and it is undisputed that Plaintiff violated the rule.[12]  (*See id.* at 195:6-196:11).

Finally, with regard to Plaintiff's July 2013 suspension, Plaintiff argues that prior discrimination allegations against Holtz (made by a different worker) show that Defendant's decision to suspend Plaintiff for his May 2013 rule violation were pretextual.  Plaintiff identifies a single allegation of discrimination lodged by another employee, Vanessa Sharp.  Plaintiff alleges that Sharp filed an internal complaint of racial favoritism against a number of Defendant's managers, including Holtz.  (*See* Doc. 32, Ex. B-1, Holtz Dep. 37:23-38:18).  But this evidence has no bearing on Defendant's decision to suspend *Plaintiff* for his admitted work rule violations.  Indeed, it is undisputed in the Rule 56 record that Holtz was ultimately exonerated of any wrongdoing and Sharp's allegation was found to be without merit.  (*See id.* at 57:24-58:14).

Plaintiff has failed to carry his burden of showing that Defendant's proffered reasons for Plaintiff's discipline were a pretext, *i.e.*, that they were false and that Defendant's real, undisclosed reason for the discipline was Plaintiff's race.  *See Burback*, 963 F. Supp. 2d at 1262-63.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's race discrimination claims.

---

[12] This is not a case in which the court must decide how this question would come out if there were a dispute as to whether Plaintiff violated the work rule and Defendant was relying upon a "good faith belief" that he had violated the rule.  *See Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977) (recognizing "good faith belief" standard.  In that event, Holtz's initial statement that he was not going to write Plaintiff up may create an issue of fact as to whether Holtz and Defendant had a good faith belief that Plaintiff actually violated a work rule.  But that is not the case here because here Plaintiff admits -- quite candidly -- that he violated the rule contained in Bulletin 505.  Whether or not Holtz said it was not then his intent to write Plaintiff up, he was well within his authority to subsequently do so.

### B.      Plaintiff's Claims of Retaliation

Plaintiff's Complaint also alleges retaliation pursuant to Title VII and § 1981.  Thus, the court again applies the familiar *McDonnell Douglas* framework in evaluating a plaintiff's assertions of retaliatory conduct via circumstantial evidence.  (Doc. 1 at 5 (Count One and Two)).  For the reasons outlined below, the court concludes that Plaintiff has likely failed to establish a *prima facie* case of retaliation; but even if he has done so, Defendant has offered legitimate, nonretaliatory reasons for its actions that are not pretextual.  That is, Plaintiff has not raised an inference of retaliation and, in any event, has failed to show that Defendant's reasons for disciplining him were a pretext for retaliation.

### 1.      Plaintiff's *Prima Facie* Case Proof

It is axiomatic that Plaintiff bears the initial burden of establishing a *prima facie* case of retaliation.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  To establish a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the two.  *Id.* at 1266.  Defendant challenges Plaintiff's ability to establish a causal connection between Plaintiff's protected activity and the subsequent adverse employment action.  For the reasons outlined below, the court concludes that, at best, Plaintiff can only establish a sufficient temporal connection between his June 26, 2013, ethics complaint and his July 25, 2013, suspension.

Defendant argues that Plaintiff's complaints and subsequent discipline lack temporal proximity and are insufficient to raise an inference of causation.  "If there is a substantial delay between the protected expression and the adverse action . . . the complaint of retaliation fails as a matter of law".  *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004).  Both the Eleventh Circuit and the Supreme Court have held that "mere temporal proximity between . . . knowledge

of protected activity and an adverse . . . action . . . must be very close.' " *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  Although some courts have held as much as a one month period between protected expression and adverse action is not too protracted, the Supreme Court has indicated that a three to four month lag is insufficient to show a causal connection.  *See Breeden*, 532 U.S. at 273 (citing favorably *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (four-month period insufficient)); *see also Higdon*, 393 F.3d at 1220; *Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011) (citing *Thomas v. Copper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (a "three to four months disparity between the statutorily protected expression and the adverse employment action is not enough to establish causation")).

Plaintiff does not contest that his 2012 assessment and suspension lack sufficient temporal proximity with his June 2010 protected activity to sustain a retaliation claim.  Instead, Plaintiff argues that his July 2013 suspension was in retaliation for his "ongoing" EEOC charge filed in December 2012 and his June 2013 internal discrimination complaint.  (Doc. 33, Pl. Resp., at 13).[13]  First, there is simply nothing in the Rule 56 record to suggest that there is sufficient temporal proximity (or any causal connection, for that matter) between Plaintiff's December 18, 2012 EEOC charge of discrimination and his July 25, 2013 suspension.  More than seven months passed between Plaintiff's protected activity and the adverse employment action.  A seven month gap is insufficient, as a matter of law, to raise an inference that an adverse employment action was, or could have been, the result of Plaintiff's protected activity.

---

[13] Plaintiff also argues he suffered retaliation for Bolton's allegations of discrimination in the June 2013 hearing.  However, this argument is simply not persuasive.  Nothing in the record even hints that Defendant was retaliating against Plaintiff for Bolton's protected conduct.

Second, it is undisputed that Holtz did not know of Plaintiff's 2012 EEOC charge when he assessed Plaintiff's May 23, 2013, rule violation.

On the issue of temporal proximity, Plaintiff's contentions regarding his June 26, 2013 ethics complaint and his July 25, 2013 suspension present perhaps a slightly better foundation for his *prima facie* case.[14]  The court assumes (without deciding) that Plaintiff has -- even if barely -- nudged the ball far enough down the field to establish a *prima facie* case in that limited respect.

### 2.   Defendant Has Articulated a Legitimate, Nonretaliatory Reason for Suspending Plaintiff

Similar to the analysis of Plaintiff's discrimination claims, after assessing whether Plaintiff has established a *prima facie* case, the next step is to determine whether Defendant has articulated legitimate, non-discriminatory reasons related to each of Plaintiff's suspensions.  *See Brooks*, 446 F.3d at 1162.  As discussed above, Defendant carries this "exceedingly light" burden of production.  *See Perryman*, 698 F.2d at 1141.  With regards to both suspensions,[15] Defendant was disciplining Plaintiff for admitted rule violations.  Accordingly, the court concludes that Defendant has articulated a legitimate, nonretaliatory reason for suspending Plaintiff's suspensions.

### 3.   Plaintiff Has Failed to Show that Defendant's Reasons for His Discipline are Pretextual

Once a defendant has offered a legitimate nonretaliatory reason for an employment action, "[t]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination."  *Brooks*, 446

---

[14] It is disputed whether Swafford had actual knowledge of Plaintiff's protected activity as of July 25, 2013, when Plaintiff's suspension was handed down.  Drawing every inference in favor of Plaintiff, at least for purposes of summary judgment, the court assumes without deciding that Swafford had actual knowledge of Plaintiff's June 2013 ethics complaint when he made the decision to suspend Plaintiff.

[15] Although Plaintiff has not established a *prima facie* case as to his first suspension, the court nevertheless evaluates Defendant's articulated reasons as to both decisions out of an abundance of caution.

F.3d at 1163 (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993)).  A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).

Here, because Defendant has articulated a legitimate, nonretaliatory reason for suspending Plaintiff, the burden shifts to Plaintiff to "meet it head on and rebut it." *Holland*, 677 F.3d at 1055 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). Plaintiff cannot survive a motion for summary judgment simply by "quarrelling with the wisdom of [an employer's] reason." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013). "It is emphatically not the court's job to presume or judge whether an employment decision is fair or wise, but only whether it is legal." *Winborn v. Supreme Beverage Co.*, No. 2:11-CV-00047-RDP, 2012 WL 5511014, at *12 (N.D. Ala. Nov. 8, 2012), *aff'd*, 572 F. App'x 672 (11th Cir. 2014).  To succeed, Plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Defendant's rationale.  *Holland*, 677 F.3d at 1055-56 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  This Plaintiff has failed to do.

Plaintiff's only new pretext argument here is that Defendant's retaliatory motive is revealed by its alleged disparate treatment of Plaintiff's comparator, B.M. Johnson.  As discussed in more detail above, this argument fails because Johnson is not an appropriate comparator.  Johnson had a different supervisor than Plaintiff, and the incident involving Johnson occurred under a different set of circumstances.  Furthermore, Plaintiff's supervisor, Holtz, assessed Plaintiff's violation on May 23, 2013, nearly a month *before* Plaintiff engaged in the only protected activity that could form the basis of his retaliation claim (*i.e.*, his June 26,

2013, internal ethic's complaint).   It is undisputed that Holtz had no knowledge of Plaintiff's prior protected activity when he assessed Plaintiff's May 23, 2013, rule violation.

Finally, Plaintiff's pretext argument fails with regard to his retaliation claim for the same reasons that it failed with regard to his discriminatory discipline claim.   Plaintiff has not offered any evidence tending to show that Defendant's legitimate reasons for disciplining Plaintiff are false.   Plaintiff does not dispute that he violated Defendant's operating rules in May 2013 by failing to correctly secure his train.   (Doc. 26, Pl. Dep. 12:32-13:30, 22:15-26).   For this admitted violation, Plaintiff was disciplined in lockstep with Defendant's published disciplinary policy. (Doc. 31-3, IDPAP, at 3; Doc. 28-10, Discipline Letter, July 25, 2013).   Furthermore, no record evidence has been offered to demonstrate that Defendant's real reason for Plaintiff's July 2013 suspension was retaliation for his June 26, 2013, ethics complaint. Perhaps most importantly, Plaintiff has not offered a single comparator who is otherwise similarly situated to Plaintiff in all relevant respects, but who received disparate treatment on account of his (or her) race or because he engaged in protected conduct.

## IV.   Conclusion

Ultimately, Plaintiff has presented little more than argument that his admitted rule violation should have been overlooked, despite Defendant's clear rules to the contrary.   This court does not sit as a super-personnel board, *see Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc), and declines the invitation to become the Human Resources Director for the Northern District of Alabama.   "That is, the court has been specifically instructed by the court of appeals not to be concerned with whether an employment decision is prudent or even fair, but only if it was motivated by [an] unlawful [reason]." *Lawson v. S T Bunn Const.*, 2014 WL 4258115 (N.D. Ala. 2014) (Proctor, J.).   For these reasons, Defendant is entitled to summary

judgment on each of Plaintiff's retaliation claims. Accordingly, Plaintiff's claims are due to be dismissed with prejudice.

A separate order will be entered in accordance with this Memorandum Opinion.

**DONE** and **ORDERED** this March 25, 2015.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE